United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   DANIEL PIZZA,                           No. C-13-0688 MMC

12            Plaintiff,              **ORDER GRANTING IN PART AND
                                      DENYING IN PART DEFENDANT'S**
13      v.                            **MOTION FOR SUMMARY JUDGMENT**

14   FINANCIAL INDUSTRY REGULATORY
     AUTHORITY, INC.,
15
              Defendant.
16   _____/

17

18          Before the Court is defendant Financial Industry Regulatory Authority, Inc.'s

19   ("FINRA") motion for summary judgment, filed February 25, 2014.  Plaintiff Daniel Pizza

20   ("Pizza") has filed opposition, to which FINRA has replied.  Having read and considered the

21   papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

22                                **BACKGROUND**

23          Pizza is a former employee of FINRA,[2] who accepted an offer of employment in

24   December 2005, was given the option to start work in December 2005 or January 2006,

25   _____

26          [1]By order filed April 30, 2014, the Court took the matter under submission.

27          [2]FINRA is a "self-regulatory organization under the Securities Exchange Act."  See
     Sacks v. SEC, 648 F.3d 945, 948 (9th Cir. 2011) (internal quotation and citation omitted).
28   FINRA is "responsible for regulatory oversight of all securities firms that do business with
     the public; professional training, testing and licensing of registered persons; and arbitration
     and mediation."  See id. (internal quotation and alteration omitted).

and chose to begin work in January 2006.  In the operative complaint, the First Amended

Complaint ("FAC"), Pizza alleges that, at the time he accepted the job offer, FINRA told him

that his rights under FINRA's pension plan would not be affected if he started work in

January 2006.  In July 2011, however, Pizza was advised that because he started work in

2006, he was not entitled to full pension benefits until he reached the age of 65, whereas if

he had started in 2005, he would have been entitled to full pension benefits at age 62.

Pizza further alleges that after he complained about FINRA's determination, FINRA

retaliated against him.

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant

summary judgment if the movant shows that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P.

56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986),

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co.

v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary

judgment show the absence of a genuine issue of material fact.  Once the moving party

has done so, the nonmoving party must "go beyond the pleadings and by [its] own

affidavits, or by the depositions, answers to interrogatories, and admissions on file,

designate specific facts showing that there is a genuine issue for trial."  See Celotex, 477

U.S. at 324 (internal quotation and citation omitted).  "When the moving party has carried

its burden under Rule 56[ ], its opponent must do more than simply show that there is some

metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  "If the

[opposing party's] evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

"[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light

most favorable to the party opposing the motion."  See Matsushita, 475 U.S. at 587

(internal quotation and citation omitted).

**DISCUSSION**

Pizza alleges two causes of action, a claim for breach of fiduciary duty and a claim for retaliation.

**A. Breach of Fiduciary Duty**

Under ERISA, a plan fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," see 29 U.S.C. § 1104(a)(1), and do so "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," see 29 U.S.C. § 1104(a)(1)(B).

In his FAC, Pizza alleges that FINRA, as administrator of its pension plan, breached its fiduciary duty to him when, in 2005, it "misstated the age at which [ ] Pizza would become eligible for [full] retirement benefits" under FINRA's pension plan and "confused [him] with its statements as to when he would become eligible for [those] benefits." (See FAC ¶¶ 39-41.)  FINRA argues it is entitled to summary judgment on said claim because, inter alia, the claim is barred by the applicable statute of limitations.

**1. Factual Background**

The following facts are undisputed, or, if disputed, are stated in the light most favorable to Pizza.

In December 2005, Pizza, who was then 49 years old, applied for a position with FINRA as a compliance officer.  (See Geannacopulos Decl. Ex. V; Pickens Decl. Ex. A ¶ 2 ("Pizza Aff.").)  Pizza was interviewed by Kathleen Hart ("Hart"), Robert Kormos ("Kormos"), and Debra Pohlson ("Pohlson"), and was advised by "one of these individuals" that "full retirement benefits were available to FINRA employees at the age of sixty-two." (See Pizza Aff. ¶¶ 3-4.)  Thereafter, in the "time frame of December 19-23, 2005," Pohlson

//
//
//

3

1   offered Pizza the position, and he accepted.  (See id. ¶ 2; Pizza Dep. at 242:6-14.)[3]  During

2   said conversation, Pizza and Pohlson "discussed whether [Pizza] should begin work with

3   FINRA in the last part of December 2005, or wait until January 2006 to physically report to

4   work" and "whether it would make any difference to [Pizza's] status or standing as an

5   employee at FINRA who was eligible to rec2eive FINRA benefits if [Pizza] waited until after

6   the holidays and physically reported to work with FINRA in January 2006."  (See Pizza Aff.

7   ¶ 5.)  According to Pizza, Pohlson told him "it would make no difference if [he] waited until

8   after the holidays, and physically reported to work at FINRA in January of 2006," to which

9   Pizza responded that he would "physically report to work on or about January 3, 2006."

10  (See id. ¶ 6.)[4]  Pizza began working for FINRA on January 3, 2006 (see Pizza Dep. at 68:3-

11  20), and, at that time, had a goal of retiring at age 62 (see id. at 214:21-23).

12          The summary plan description ("SPD") of the "NASD Pension Plan"[5] effective

13  January 1, 2006 (see Geannacopulos Decl. Ex. S at 1, 9) provides that the "normal

14  retirement for most employees is the date [the employee] reach[es] age 65," but that an

15  employee can take "early retirement" if the employee is at least 55 years of age and has "at

16  least 10 years of benefit service" (see id. Ex. S at 12).  The SPD, in the following two

17  separate paragraphs, describes the amounts payable to an employee who takes early

18  retirement:

19          If you start receiving benefits earlier than your normal retirement date, your
            benefit payments will be reduced since you'll be receiving payments over a
20          longer period of time.  There is an exception to this – you may receive
            unreduced benefit payments as early as age 62 if you were hired prior to
21          January 1, 2006.

22  (See id.)

23  _____

24          [3]Excerpts from Pizza's deposition are attached as Exhibit B to the Declaration of
    Nick C. Geannacopulos and as Exhibit A to the Declaration of Emily E. Barker; the entirety
25  of the deposition is attached as Exhibit B to the Declaration of Andrew L. Pickens.

26          [4]FINRA objects to Pizza's affidavit to the extent it includes the above-cited
    statements attributed to FINRA employees.  In light of the Court's ruling, discussed below,
27  that Pizza's claim for breach of fiduciary duty is barred by the statute of limitations, the
    Court does not further address those objections herein.

28          [5]NASD is the former name of FINRA.  (See Pickens Decl. Ex. G at 14:21-17:20.)

1

2
> If you leave [FINRA] before your normal retirement date, but on or after your early retirement date, your benefit will be based on your earnings and service up to your early retirement date, using the formulas shown [elsewhere in the SPD]. This benefit will be reduced if you begin receiving benefit payments earlier than your normal retirement date, to allow for benefit payments over a longer period of time. However, if you were hired prior to January 1, 2006 and you are at least age 62 and have 10 years of service when you retire, your benefit will not be reduced for early payment.

3

4

5

6 (See id. Ex. S at 22.)

7          In early July 2011, FINRA "institut[ed] a new pension plan, and the employees

8 needed to decide whether they wanted to remain in the old pension plan or move to the

9 new pension plan." (See Pizza Dep. at 135:22-24.) As part of this process, FINRA

10 provided employees with "documentation"; the documentation provided to Pizza, which he

11 received over "the 4th of July weekend," stated that because he was not hired before

12 January 1, 2006, he was ineligible under the existing plan for full retirement benefits until

13 age 65. (See id. at 135:25-136:3; 136:14-16, 172:1-19.) Thereafter, Pizza spoke to Karen

14 Dickey ("Dickey"),[6] and told her the documentation he received was "incorrect" because he

15 had been "hired in 2005" and, thus, he "was under the impression that [he] had full benefits

16 at age 62." (See Pizza Dep. at 136:3-5, 20-62.) Dickey referred Pizza to Jeremious

17 Henderson ("Henderson"),[7] who advised Pizza on July 6, 2011 or July 7, 2011, that "for

18 purposes of retirement benefits, it's when [an employee] actually start[s] work that [the

19 employee] begin[s] to get on the plan." (See Pizza Dep. at 135:7-19; 223:13-19.)

20          **2. Statute of Limitations**

21          FINRA argues that Pizza's claim for breach of fiduciary duty, which claim is based

22 on the statements made to Pizza in December 2005, is barred by the statute of limitations.

23 As discussed below, the Court agrees.

24 //

25 //

26 _____

27          [6]Dickey was the "HR manager that was responsible for the West Region." (See Pickens Decl. Ex. G at 89:16-18.)

28          [7]Henderson was "Vice President of HR Management." (See Pickens Decl. Ex. D.)

5

The applicable statute of limitations, and statutory exceptions, are as follows:

No action may be commenced under [ERISA] with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

See 29 U.S.C. § 1113.

Here, "the date of the last action which constituted a part of the breach," see 29 U.S.C. § 1113(1), was January 3, 2006, the date on which Pizza first began to work for FINRA, having assertedly relied on the statements made to him by Pohlson in December 2005 that the date he started work would not affect his eligibility for full retirement benefits at age 62.  See In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 242 F.3d 497, 505-06 (3rd Cir. 2001) (holding claim for breach of fiduciary duty based on misstatement accrues on date plan participant relies to his detriment on statement).  Under the test set forth in § 1113(1), Pizza's claim for breach of fiduciary duty had to be filed no later than January 3, 2012, i.e., six years after January 3, 2006.

"[T]he earliest date on which [Pizza] had actual knowledge of the breach," see 29 U.S.C. § 1113(2), was the date Henderson advised Pizza he was not entitled to full retirement benefits until he turned 65, which, Pizza asserts, was on or about July 7, 2011 (see Pizza Dep. at 135:7-136:10).  Under the test set forth in § 1113(2), Pizza's claim for breach of fiduciary duty had to be filed no later than July 7, 2014, i.e., three years after July 7, 2011.

Given that January 3, 2012 is "the earlier of" said two deadlines, see 29 U.S.C. § 1113, and given that Pizza filed his initial complaint on February 14, 2013, more than a year thereafter, Pizza's claim for breach of fiduciary duty is barred, in the absence of

6

1   Pizza's raising a triable issue of fact with respect to an exception to the statute of

2   limitations.  In that respect, Pizza relies on the above-quoted statutory exception of "fraud

3   or concealment."  See id.  Pizza fails, however, to establish a triable issue regarding such

4   exception, for two separate reasons.

5       First, the Ninth Circuit has held that a plaintiff who seeks to toll an applicable statute

6   of limitations on grounds of fraudulent concealment "must have included the allegation in

7   [his] pleadings," and has further held that "this rule applies even where the tolling argument

8   is raised in opposition to summary judgment."  See Wasco Products, Inc. v. Southwall

9   Technologies, Inc., 435 F.3d 989, 991 (9th Cir. 2006) (collecting cases); see also Barker v.

10  American Mobil Power Corp., 64 F.3d 1397, 1402 (9th Cir. 1995) (holding "'fraud or

11  concealment' exception in [§ 1113] incorporates the common law doctrine of 'fraudulent

12  concealment'").  Here, Pizza failed to include in the FAC any facts to support a finding that

13  Pohlson "made knowingly false misrepresentations with the intent to defraud" Pizza, or that

14  she, or any other person acting on behalf of FINRA, took "affirmative steps" to "conceal any

15  alleged fiduciary breaches," see Barker, 64 F.3d at 1401 (setting forth showing necessary

16  to establish "fraud or concealment" exception), and, consequently, Pizza cannot rely on

17  such an exception at this stage of the proceedings.

18      Second, assuming, arguendo, the "fraud or concealment" exception could be

19  considered at this stage, Pizza fails to make a sufficient factual showing to raise a triable

20  issue as to its applicability here.  In support of its motion, FINRA has offered evidence that

21  Pohlson, at the time she offered Pizza employment, was unaware that FINRA had made

22  changes to its pension plan (see Geannacopulos Decl. Ex. X at 35:1-4), and Pizza has

23  offered no evidence to the contrary, let alone evidence that Pohlson, in December 2005,

24  knew that FINRA would interpret the 2006 plan in the manner disclosed to Pizza in July

25  2011.[8]

26  _____

27      [8]Indeed, there is no suggestion in the record that FINRA had any occasion to
    interpret the 2006 pension plan as it applied to persons who accepted employment in 2005
28  and began work in 2006, until it prepared the documentation sent to Pizza in July 2011 and
    thereafter responded to Pizza's inquiry as to his hiring date for purposes of the plan.

1   Accordingly, FINRA is entitled to summary judgment on Pizza's claim for breach of

2   fiduciary duty.

3   **B. Retaliation**

4   Under ERISA, it is "unlawful" to "discharge, fine, suspend, expel, discipline, or

5   discriminate against a participant or beneficiary for exercising any right to which he is

6   entitled under the provisions of an employee benefit plan." See 29 U.S.C. § 1140.  A

7   retaliation claim under § 1140 is assessed under the "McDonnell Douglas burden-shifting

8   framework."  See Lessard v. Applied Risk Mgmt., 307 F.3d 1020, 1025 and n.3 (9th Cir.

9   2002) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under said

10  framework, the "plaintiff must first establish a prima facie case of retaliation by showing that

11  [he] engaged in a protected activity, that [he] was thereafter subjected by [his] employer to

12  [an] adverse employment action, and that a causal link exists between the two."  See

13  Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).  "Once the plaintiff has

14  established a prima facie case, the burden of production devolves upon the defendant to

15  articulate some legitimate, non-retaliatory reason for the adverse action."  Id.  "If the

16  defendant meets this burden, the plaintiff must then show that the asserted reason was a

17  pretext for retaliation."  Id.

18  In the FAC, Pizza alleges that he engaged in activity protected by § 1140 (see FAC

19  ¶¶ 12-13, 27), and that, thereafter, "FINRA's personnel subjected [Pizza's] personal

20  financial affairs to intense and unnecessary scrutiny" (see FAC ¶ 14) and "constructively

21  terminated" him (see FAC ¶ 19, 29).  Additionally, in opposing the instant motion, Pizza

22  identifies another assertedly retaliatory act, specifically, his not having been asked to

23  participate in FINRA's "Mentoring Circles training program."  (See Pizza Aff. ¶ 8).

24  FINRA does not argue that Pizza lacks evidence to establish that he engaged in

25  protected activity, and, indeed, the record includes such evidence.  Specifically, after Pizza

26  was advised by Henderson, on or about July 7, 2011, that FINRA deemed him as having

27  been hired in 2006 for purposes of the pension plan, Pizza requested that Henderson

28  provide him with "documentation as to [when] FINRA employees were notified that the date

1   of employment must be prior to January 1, 2006, in order to receive full retirement benefits

2   at age 62." (See Pizza Dep. at 135:7-16; see also id. at 175:19-22.)  Further, at a meeting

3   held July 20, 2011, Pizza told Hart, his direct supervisor, and Don Lopezi ("Lopezi"), the

4   District Director, that he disagreed with Henderson's position and would be meeting with an

5   attorney regarding the matter. (See Pickens Decl. Ex. D.)

6       FINRA argues, however, that Pizza cannot establish the remaining elements of a

7   prima facie case, or, alternatively, that Pizza cannot establish FINRA's actions were

8   pretextual in nature.  The Court considers in turn FINRA's arguments as to each asserted

9   adverse employment action.

10      **1. Directives to Sell Securities and to Forfeit Profits**

11          **a. Factual Background**

12      The following facts are undisputed, or, if disputed, are stated in the light most

13   favorable to Pizza.

14      At the time Pizza began to work for FINRA, he became subject to FINRA's "Code of

15   Conduct," which, inter alia, prohibits "FINRA employees tasked with oversight of member

16   firms" from investing in such firms.  (See Lopezi Decl. ¶ 4.)  Among its provisions, the Code

17   of Conduct states that if an employee "acquire[s], control[s], or derive[s] a financial benefit

18   from a security position that is prohibited by the Code of Conduct, the security position

19   must be liquidated immediately" and the employee "will be required to forfeit any resulting

20   profits to FINRA." (See id. Ex. A at FINRA000833.)  To assist its employees in complying

21   with the Code of Conduct, FINRA provides to its employees a "Prohibited Company List," in

22   which it identifies "prohibited investments." (See id. ¶ 4.)

23      On August 26, 2010, FINRA issued a memorandum stating it had added thirty-two

24   companies to the "Prohibited Company List," including Deutsche Bank, Bank of America,

25   and Citigroup Inc., and advised its employees that, under the Code of Conduct, employees

26   were not allowed to purchase debt securities, such as exchange-traded notes ("ETNs"), or

27   equity securities issued by those companies.  (See Geannacopulos Decl. Ex. G.)

28   //

9

1                                   **(1)  Citigroup/Merrill Lynch**

2         On August 22, 2010, four days before FINRA issued the above-referenced August

3 26, 2010 memorandum, Natalie Norris ("Norris"), FINRA's Ethics Manager, advised Pizza

4 by email that FINRA was going to be adding companies to its Prohibited Company List,

5 including Citigroup, a company in which she believed Pizza then held investments.  (See id.

6 Ex. E.)  Norris further stated in her email that the deadline for employees to sell

7 investments in the companies that were going to be added to the Prohibited Company List

8 was April 30, 2011, and that Pizza could request a "waiver to permit extension of the

9 deadline," if liquidating his holdings prior to April 30, 2011 "would create undue hardship."

10 (See id.)  Pizza responded to Norris's email, acknowledging that his "family trust" owned

11 shares in Citigroup; Pizza stated that selling the shares "[wouldn't] be a problem" and

12 requested Norris provide him a "reminder as the deadline [got] closer."  (See id.)  He did

13 not receive a reminder from Norris.  (See Pizza Dep. at 156:18-157:3.)  Thereafter, on

14 August 23, 2011, Gary Ford, FINRA's Associate General Counsel, told Pizza that the

15 "Pizza family survivor's trust" had to sell its Citigroup shares, as well as its shares issued by

16 Merrill Lynch,[9] and Pizza, through his broker, thereafter sold those securities.  (See Pizza

17 Dep. at 152:1-2, 153:8-154:3, 160:6; Pickens Decl. Ex. G at 140:19-22, 145:1-21, Ex. I;

18 Geannacopulos Decl. Ex. N.)

19                                         **(2)  Deutsche Bank**

20         On July 1, 2011, Lopezi sent Norris an email in which he stated that in the course of

21 "completing [his] second quarter review," he learned Pizza had owned an ETN that

22 appeared to have been issued by Deutsche Bank, and asked Norris to "let [him] know [her]

23 thoughts."  (See Geannacopulos Decl. Ex. I.)  On July 8, 2011, Norris responded to

24 _____

25      [9]FINRA requests the Court take judicial notice of the merger of Merrill Lynch with
Bank of America and, specifically, that such merger "closed" on January 1, 2009, prior to

26 FINRA's issuance of the August 26, 2010 memorandum, and that Merrill Lynch thereafter
has "operate[d] as a wholly owned subsidiary of Bank of America."  See McReynolds v.

27 Merrill Lynch & Co., 694 Fed. 3d 873, 878 (7th Cir. 2012).  The request is hereby
GRANTED.  Indeed, as Pizza acknowledged at his deposition, "Merrill Lynch [was]

28 basically Bank of America" because "Bank of America had bought Merrill Lynch."  (See
Pizza Dep. at 122:22-123:3, 154:6.)

1   Lopezi's email by confirming that the ETNs in which Pizza had invested were issued by

2   Deutsche Bank and thus "prohibited securities," and stated she would "examine[ ] the

3   account statements further" and thereafter provide a "list of transactions" to Lopezi."  (See

4   id.)  Norris further added that, "[a]t a minimum, [Pizza] will be required to forfeit the profit

5   from [the] transactions to FINRA."  (See id.)

6       On July 21, 2011, Lopezi told Pizza that he was required to forfeit $905.30 in profits

7   he had earned when, on October 29, 2010 and January 28, 2011, he sold ETNs issued by

8   Deutsche Bank that he had purchased between October 10, 2010 and December 31, 2010.

9   (See Pizza Dep. at 129:7-130:11, 145:7 - 145:1; 148:9-12; Pickens Decl. Ex. H.)

10                    **b. Analysis Under McDonnell Douglas Framework**

11      FINRA argues that Pizza lacks evidence to establish the directives, that he sell

12  securities in companies on the Prohibited Company List and forfeit profits earned when he

13  sold such securities, were retaliatory in nature.  The Court agrees.

14      First, Pizza cannot establish a causal link exists between the directive that he sell his

15  Citigroup and Merrill Lynch shares and his protected activity, given that FINRA, in August

16  2010, directed him to sell those shares by April 30, 2011, and he first engaged in protected

17  activity in July 2011.  Although FINRA did remind Pizza of such obligation in August 2011,

18  the directive to sell the shares had already been made long before that date.  Pizza cites no

19  authority suggesting that an employee can ignore his employer's directive, then engage in

20  protected activity, and, later, when his employer reminds him of his existing obligation to

21  comply with its prior directive, contend such later reminder is retaliatory.[10]

22      Second, with respect to each directive challenged by Pizza, FINRA has identified a

23  legitimate, non-retaliatory reason.  See Cohen, 686 F.2d at 796.  Specifically, FINRA, "the

24

25      [10]FINRA also argues that its directive that Pizza forfeit the profits realized from his
    Deutsche Bank securities occurred prior to the first date on which Pizza engaged in
26  protected activity.  On the present record, however, the Court cannot make such finding as
    a matter of law.  Although, as discussed above, Lopezi, prior to any protected activity,
27  questioned whether one of Pizza's holdings was issued by Deutsche Bank, the record at
    present contains no evidence that the decision to require Pizza to forfeit the profits
28  therefrom was made prior to his protected activity.

                                        11

1   primary private-sector regulator of America's securities industry," relies on its policy

2   prohibiting employees from making certain investments (see Geannacopulos Decl. Ex. A at

3   1, 6-7), including investments in any company that "derives 10 percent or more of its

4   revenues from broker-dealer activities" (see id. Ex. G).  As explained in FINRA's Code of

5   Conduct, such policy is necessary to avoid conflicts of interest or the appearance of any

6   such conflict.  (See id. Ex. A at 6.)

7          It is undisputed that Pizza, under the Code of Conduct, was required to sell his

8   investments in Citigroup and Merrill Lynch no later than April 30, 2011, and that he did not

9   do so.  It is also undisputed that Pizza's investment in securities issued by Deutsche Bank,

10  each of which was purchased after said company was placed on the Prohibited Company

11  List on August 26, 2010, were in violation of the Code of Conduct.  Pizza offers no

12  evidence to support a finding that, notwithstanding the provisions of the Code of Conduct,

13  FINRA should have allowed him to continue to hold his investments in Citigroup and Merrill

14  Lynch and/or to retain the profits he made when he sold his investments in Deutsche Bank.

15  Pizza does not, for example, assert that FINRA selectively enforces the Code of Conduct

16  against employees who engage in protected activity.  See EEOC v. Flasher Co., 986 F. 2d

17  1312, 1317-19 (10th Cir. 1992) (holding, where defendant's articulated reason for

18  subjecting plaintiff to adverse employment action is violation of workplace rule, plaintiff has

19  burden to demonstrate that any differential application of rule "was caused by intentional

20  discrimination against a protected class").

21         Accordingly, to the extent Pizza's retaliation claim is based on FINRA's requiring him

22  sell securities issued by Citigroup and Merrill Lynch, and to forfeit $905.30 in profits he

23  earned by selling securities issued by Deutsche Bank, FINRA is entitled to summary

24  judgment.

25  //

26  //

27  //

28  //

**2.  Mentoring Circles**

**a.  Factual Background**

The following facts are undisputed, or, if disputed, are stated in the light most favorable to Pizza.

FINRA had a "Mentoring Circles Program," a "four-month program [ ] designed to provide 20 high-performing employees . . . with an immersion into the 12 FINRA Leadership Characteristics through the sharing of experiences by senior leaders."  (See Pickens Decl. Ex. J at FINRA001176.)  The program was "an opportunity for high-performing examiners at the more senior ranks to receive coaching and mentoring from senior staff."  (See id. Ex. G at 170:11-14.)

 In August 2011, FINRA began preparations for its third Mentoring Circles Program, which program was scheduled to begin September 26, 2011.  (See id. Ex. J at FINRA001174.)  Specifically, in August 2011, FINRA's Human Resources Department identified "274 employees eligible for program participation" and planned to invite each such employee "to opt in to [a] lottery selection process to determine the 20 participants." (See id.)  Before notifying those 274 employees, however, the Human Resources Department provided FINRA managers with the opportunity to "comment on the selected participants in advance of participant notification."  (See id.; see also id. Ex. G at 171:25-172:11.)

On August 8, 2011, Joseph McCarthy ("McCarthy"), Senior Vice President and Regional Director of FINRA, sent an email to Lopezi, stating that Pizza was on the list of eligible participants, and that Lopezi "[might] wish to give Tracy [Johnson ("Johnson")] a call to discuss allowing him to opt in."  (See id. Ex. J at FINRA001173.)[11]  In said email, McCarthy noted, "While [Pizza] meets the threshold criteria, his recent statements and conduct regarding the retirement matter have been very disconcerting."  (See id. Ex. J at //

_____

[11]Johnson was FINRA's "head of HR."  (See id. Ex. G at 174:14-15.)

13

1   FINRA001173).[12]  Prior to August 8, 2011, Lopezi had advised McCarthy, who was

2   Lopezi's boss, of "Pizza's belief that . . . the pension plan should be interpreted to allow him

3   to be in[ ] the earlier retirement age" and that Pizza had challenged FINRA's interpretation

4   of the plan.  (See id. Ex. G at 177:2-7, 177:20-178:6.)  Although Lopezi does not recall

5   whether he spoke to Johnson after receiving the email from McCarthy (see id. Ex. G at

6   174:4-175:8), FINRA thereafter did not ask Pizza to participate in the Mentoring Circles

7   Program (see Pizza Aff. ¶ 8).

8                    **b.  Analysis Under McDonnell Douglas Framework**

9        FINRA contends Pizza lacks evidence to base a retaliation claim on his not having

10  been asked to participate in the Mentoring Circles Program, and makes three arguments in

11  support thereof.

12       First, FINRA asserts, Pizza "has laid no foundation for what [ ] McCarthy meant in

13  [the] email."  (See Def.'s Reply, filed April 15, 2014, at 17.)  Pizza, however, has offered

14  evidence, as discussed above, that McCarthy was aware, before he sent the subject email,

15  that Pizza had challenged FINRA's interpretation of its pension plan.  Although, as FINRA

16  suggests, McCarthy may have been "disconcerted" by some other conduct, the present

17  record contains no evidence thereof and, as noted, the Court, at the summary judgment

18  stage, must construe the evidence in the light most favorable to Pizza.  See United States

19  v. Diebold, Inc., 369 U.S. 654, 655 (1962) (holding, "[o]n summary judgment[,] the

20  inferences to be drawn from the underlying facts contained in [submitted] materials must be

21  viewed in the light most favorable to the party opposing the motion").

22       Second, FINRA observes, Lopezi testified that he could not recall if he spoke to

23  Johnson after he received McCarthy's email and, further, that he did not know whether

24  Pizza was invited to participate in the program.  FINRA does not elaborate as to how

25  Johnson's testimony forecloses Pizza from establishing his claim, and, given the evidence

26

27       [12]Although FINRA notes that Pizza has "never pleaded any actions by [ ] McCarthy
    as the basis for his retaliation claim" (see Def.'s Reply at 9:1-2), FINRA has not shown it
28  otherwise lacked notice of such claim.

                                              14

1    that Pizza was identified as an eligible participant but thereafter was removed from the

2    eligibility list following Lopezi's receipt of McCarthy's email, the Court does not find such

3    testimony dispositive.

4         Third, and lastly, FINRA argues, again without further elaboration, that even if

5    Pizza's removal from the list was retaliatory, it was not "detrimental to Pizza," as "he had

6    less than a one in ten chance of be[ing] drawn from the lottery."  (See Def.'s Reply at 9:27-

7    28.)[13]  If, by such assertion, FINRA is contending Pizza incurred no damages, FINRA fails

8    to submit sufficient evidence to support, as a matter of law, such a finding on the present

9    record.

10        Accordingly, to the extent Pizza's retaliation claim is based on FINRA's not allowing

11   Pizza to participate in the lottery selection process for the Mentoring Circles Program,

12   FINRA is not entitled to summary judgment.

13        **3. Constructive Termination**

14             **a. Factual Background**

15        On October 12, 2011, Hart, Pizza's supervisor, sent Pizza an email scheduling a

16   meeting between Pizza and Lopezi for the next day.  (See Pizza Dep. at 182:24-183:9.)

17   Because Hart's email did not specify the subject of the meeting, Pizza asked Hart "what the

18   subject matter was going to be."  (See id. at 183:10-18, 184:7-12).  Hart stated there were

19   trades in Pizza's "parents' trust account" that Lopezi wanted to talk about (see id. at 22:12-

20   17, 184:13-14), and Pizza then "expressed [his] concern that [he] was being harassed

21   because of [his] request for pension documents" (see id. at 185:3-6).  Pizza "stay[ed] up all

22   night worrying about what was going to happen."  (See id. at 22:23-25.)

23        On October 13, 2011, at the time when the meeting with Lopezi was scheduled to

24   occur, Pizza went to Lopezi's office, but found it dark and unoccupied.  (See id. at 186:18-

25   187:2, 187:20-21.)  Pizza then went to Hart's office, at which time Hart told him, "[Lopezi's]

26   not here" and scheduled a meeting later that morning with Saju Gopal ("Gopal"), the

27

28        [13]As noted, 274 employees were identified as being eligible for the program and
     FINRA intended to select twenty using a lottery process.

1    Associate District Director, i.e., "second in command" to Lopezi.  (See id. 145:10-17,

2    148:20-11.)

3            Later that morning when he met with Gopal and Hart, Pizza stated:

4        I can't keep going on like this.  I'm being harassed.  Every day it seems like
         it's something new that I need to worry about, and today I was . . . I was
5        supposed to come in with a meeting with the director and he didn't bother
         showing up.  I'm completely stressed, my health is going to hell, and I can't
6        keep doing this.  We need to get this fixed, otherwise I'm out of here.

7    (See id. at 192:3-10.)  During the meeting, Pizza gave his FINRA "building pass," "credit

8    card," and "phone card" to Gopal, and stated "fix this or I won't be needing this."  (See id. at

9    199:1-11.)

10           After the meeting, Pizza went to say "goodbye" to two co-workers.  (See id. at

11   195:14-21, 196:1-3, 196:13-14, 197:7-25.)  Next, Pizza picked up his "personal effects"

12   from his desk, after which Hart walked him out.  (See id. at 198:11-18, 199:24-200:4.)  Hart

13   stated she was "very sorry about what was going on and she'd see what she [could] do."

14   (See id. at 200:4-7.)  Pizza replied, "Good luck getting anything done.  I've been trying for

15   four months."  (See id. at 200:7-10.)  He then went home.  (See id. at 201:1-3.)

16           Later that day, Pizza received a phone call from Dickey, the Human Resources

17   Manager, who stated, "Sorry to hear you resigned.  Your termination package will be in the

18   mail."  (See id. at 206:25-207:21.)  Pizza then sent an email to Hart and Gopal, stating, "I

19   didn't want to resign.  I just wanted this fixed."  (See id. at 194:14-18.)

20                       **b. Analysis Under McDonnell Douglas Framework**

21           FINRA argues that Pizza lacks evidence to establish he was constructively

22   terminated by FINRA.  As discussed below, the Court agrees.

23           A "constructive discharge occurs when the working conditions deteriorate, as a

24   result of discrimination, to the point that they become sufficiently extraordinary and

25   egregious to overcome the normal motivation of a competent, diligent, and reasonable

26   employee to remain on the job to earn a livelihood and to serve his or her employer."  See

27   Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000) (internal quotation and

28   citation omitted).  Put another way, the workplace conditions must be "so intolerable that a

1  reasonable person would leave the job."  See id.

2      Here, Pizza bases his claim of retaliatory constructive discharge on the directive that

3  he sell the Citigroup and Merrill Lynch securities he was holding, as well as the directive

4  that he forfeit $905.30 in profits he realized when he sold the ETNs issued by Deutsche

5  Bank.  (See, e.g., FAC ¶ 18 (alleging "FINRA was conducting harassing investigations into

6  his personal investments").)[14]  As discussed above, however, Pizza fails to offer sufficient

7  evidence to support a finding that those directives were retaliatory in nature.

8      Moreover, Pizza fails to offer sufficient evidence to support a finding that he was

9  constructively discharged.  The directives, as discussed above, were in compliance with

10  FINRA's Code of Conduct, which code was applicable to all employees during the entirety

11  of Pizza's employment with FINRA.  In short, FINRA's requiring Pizza to conform his

12  investment activity to the Code of Conduct, and thus avoid any appearance of a conflict of

13  interest, was not a workplace condition that a trier of fact could reasonably find was so

14  intolerable that a reasonable person would quit.  See, e.g., Thomas v. Douglas, 877 F.2d

15  1428, 1434 (9th Cir. 1989) (holding plaintiff deputy sheriff who had engaged in "whistle-

16  blowing activities" lacked sufficient evidence to show he was constructively terminated,

17  where plaintiff alleged he felt uncomfortable being required to work at same substation as

18  deputies whom he had reported to Internal Affairs but "was not required to perform any

19  unusually dangerous or onerous duties, and [ ] was not subjected to any harassment or

20  violent acts or any other treatment which could be considered punishment or retaliation");

21  cf. Watson v. Nationwide Ins. Co., 823 F.2d 360, 361-62 (9th Cir. 1987) (holding plaintiff

22  created triable issue of fact as to whether she was constructively terminated, where

23  employer issued "rule violation" to plaintiff but not "other similarly situated employees,"

24  "conspir[ed] to create trumped up charges of inadequate job performance," subjected her to

25  "abusive treatment and harassment for several days," told her she was "a poor and

26  _____

27      [14]Pizza does not allege or argue that FINRA's not allowing him to participate in the
   lottery for the Mentoring Circles Program was harassing in nature.  Indeed, there is no
28  suggestion in the record that, at any time while he was employed by FINRA, he was aware
   that FINRA had taken his name off the list of employees eligible to participate in the lottery.

1    incompetent supervisor," "transferred supervisory duties away from her and told her to go

2    home," and "told her that she was considered a bitch and that she could either resign or be

3    demoted to a position in which she would be supervised by her subordinate trainees").

4         Accordingly, to the extent Pizza's retaliation claim is based on a theory that he was

5    constructively terminated, FINRA is entitled to summary judgment.

6                                           **CONCLUSION**

7         For the reasons stated, FINRA's motion is hereby GRANTED in part and DENIED in

8    part, as follows:

9         1.  FINRA is entitled to judgment in its favor on Pizza's claim for breach of fiduciary

10   duty.

11        2.  FINRA is entitled to judgment in its favor on Pizza's retaliation claim to the extent

12   the claim is based on (a) FINRA's directives that he sell securities issued by Citigroup and

13   Merrill Lynch, and forfeit $905.30 in profits earned by selling securities issued by Deutsche

14   Bank, and (b) constructive termination of his employment.

15        3.  FINRA is not entitled to judgment in its favor on Pizza's retaliation claim to the

16   extent the claim is based on FINRA's not having allowed Pizza to participate in the lottery

17   selection process for the Mentoring Circles Program.

18        **IT IS SO ORDERED.**

19

20   Dated:  May 30, 2014

21                                                    MAXINE M. CHESNEY
                                                     United States District Judge

22

23

24

25

26

27

28